IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| FRAN HUBBARD WOODY,<br>  Plaintiff,<br><br>vs.<br><br>COVENANT HEALTH, et al.,<br>  Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 3:11-cv-62<br>Judge Tena Campbell |

In this employment discrimination case, Plaintiff Fran Hubbard Woody brings age discrimination claims against her employer, Defendant Parkwest Medical Center (Parkwest), and against the owner of Parkwest, Defendant Covenant Health (Covenant).[1] Ms. Woody brings these claims under the Age Discrimination in Employment Act (ADEA) and the Tennessee Human Rights Act (THRA).[2]

There are now two motions before the court. First, Covenant and Parkwest have filed a motion for summary judgment, contending, among other things, that Ms. Woody cannot make a prima facie case of age discrimination. (Docket No. 17.) Ms. Woody responded, arguing that she demonstrated a prima facie case by alleging both direct and circumstantial evidence of age discrimination.

Second, Covenant and Parkwest filed a partial motion for summary judgment, contending

---

[1] Ms. Woody originally brought other claims against the Defendants. The parties stipulated to the dismissal of those claims. (See Order, Docket No. 12; Order, Docket No. 16.)

[2] Ms. Woody also brought the claims under 42 U.S.C. § 1988 (2012), and originally requested that the court award fees pursuant to that statute. However, because § 1988 is not applicable to claims of age-related employment discrimination brought under the ADEA, Kettner v. Compass Group USA, Inc., 570 F. Supp. 2d 1121, 1128 (D. Minn. 2008), Ms. Woody has withdrawn her request for fees. (Docket No. 33.)

that Ms. Woody's claim for punitive damages related to the age discrimination claim is inappropriate because neither the ADEA nor the THRA allow for punitive damages. (Docket No. 27.) Ms. Woody responded, conceding that punitive damages are not appropriate under the ADEA and withdrawing her punitive damages claim under the THRA. But Ms. Woody argued that the ADEA does allow for liquidated damages that are punitive in nature and urges the court to interpret Ms. Woody's claim for punitive damages as a claim for liquidated damages.

For the reasons set forth below, the court DENIES the Motion for Summary Judgment (Docket No. 17), and GRANTS IN PART and DENIES IN PART the Partial Motion for Summary Judgment (Docket No. 27).

## I. FACTUAL BACKGROUND[3]

Ms. Woody (who was older than forty at the time these events occurred)[4] alleges that she was forced out of her position as shift leader because of her age. Ms. Woody has worked at the Parkwest Medical Center as a registered nurse on the night shift since 2003, and she served as shift leader from 2008 to 2010. At that time there were four shift leaders, all of whom were over forty.

In early 2010, Ms. Woody's supervisor, Crystal Wilkerson, met with Ms. Woody and the other three shift leaders to inform them that the position of shift leader was changing and that they would all have to reapply for the shift leader positions. Two days before this meeting, Matt Adams, the man who would later be selected to replace Ms. Woody, sent a text to a woman

---

[3] Facts are taken from the pleadings, depositions, affidavits, and other evidence filed by the parties in relation to the present motions.

[4] The ADEA protects employees who are over the age of forty.

coworker in which he noted Ms. Wilkerson by name and said that Ms. Wilkerson had warned him to not change his work schedule because of big changes that were happening soon. Mr. Adams warned his coworker that his conversation with Ms. Wilkerson involved confidential information and that "I think it is still supposed to be a secret whatever it is so shhh." (Adams Dep. Ex. 5, at 1, June 21, 2011, Docket No. 25-12, at 30.) Later, Mr. Adams repeatedly bragged to coworkers that he would soon fill the position of shift leader, and when asked about how he knew this, Mr. Adams implied he had inside information.

According to various hospital employees, Ms. Wilkerson stated that the four shift leaders might not be up to the challenges of 2010, that they needed to think about whether they wanted to keep their jobs or not, and that there were "young rising stars" who might want to fill the role of shift leader. (See Baker Dep. 19:2–20:23, June 27, 2011, Docket No. 25-3; Nelson Dep. 17:23–18:9, June 22, 2011, Docket No. 25-5; Parr Dep. 39:17–41:19, June 22, 2011, Docket No. 25-6; Wilkerson Dep. 62:8–15, June 21, 2011, Docket No. 25-11.) Then, according to other employees at the hospital, Ms. Wilkerson posted flyers which indicated the desirability of "young rising stars" to fill the shift leader positions. (Nelson Dep. 17:3–21; Parr Dep. 39:17–20; Aiken Dep. 7:17–9:7, June 23, 2011, Docket No. 25-9; Scott Dep. 38:2–17, June 24, 2011, Docket No. 25-10.) Ms. Wilkerson admits that she posted flyers advertising the positions but denies that the flyers contained the words "young rising stars." (Wilkerson Dep. 65:21–25, 69:1–20.)

A number of people submitted applications for the shift leader positions, including Ms. Woody. Ms. Wilkerson organized a peer review process to choose the new shift leaders. Ms. Wilkerson selected those who sat on the peer review panel and met with them to give them instructions on how to conduct the review process. Based on interactions with Ms. Wilkerson,

3

one of the members of the peer review felt that it was a forgone conclusion that a man under the age of forty, Matt Adams, would be hired to replace Ms. Woody. (Scott Dep. 27:11–30:16.)

A few weeks later, Ms. Woody was interviewed by members of the peer-review panel. The day before Ms. Woody was interviewed by members of the peer review team, Mr. Adams sent a text to the same coworker to whom he had sent the earlier messages, asking her to delete any messages that he had sent her because they contained confidential information, and so that "there is no black and white proof of what has been said." (Adams Dep. Ex. 5, at 2.) In the text, Mr. Adams requested that his coworker delete the texts and keep them secret because Mr. Adams was concerned that there were rumors at work that he had inside information about the hiring process, and that he was "just tring [sic] to cover all bases." (Id. at 3.)

Following the peer review process, Ms. Woody was informed that although she would continue her job with Parkwest as a registered nurse, she had not been selected for the position of shift leader. Instead, her position was awarded to Mr. Adams. As a result, Ms. Woody now works as a registered nurse and does not receive the prestige or additional salary afforded by the shift leader position.

## II. ANALYSIS

### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if it demonstrates, through pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury

4

could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

B.  **Claims of Age Discrimination under the ADEA and the THRA**

The ADEA prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a) (2012). Similarly, the THRA states that it is unlawful for an employer to "discriminate against an individual with respect to compensation, terms, conditions or privileges of employment" because of such individual's age. Tenn. Code Ann.§ 4-21-401(a)(1) (2005). A court applies the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA.[5] Bender v. Hecht's Dep't Stores, 455 F.3d 612, 620 (6th Cir. 2006). A plaintiff may establish a violation of the ADEA by offering either direct or circumstantial evidence of age discrimination. Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009). Ms. Woody has brought evidence of both, creating genuine issues of material fact that cannot be resolved by a motion for summary judgment.

1.  **Direct Evidence of Age Discrimination**

Direct evidence is that which, if believed, requires the conclusion that unlawful

---

[5] The Tennessee Supreme court recently held that the McDonnell Douglas burden shifting scheme is "is incompatible with Tennessee summary judgment jurisprudence," and therefore inapplicable to claims brought under the THRA. Gossett v. Tractor Supply Co. Inc., 320 S.W.3d 777, 779 (Tenn. 2010). But because the summary judgment standard is procedural rather than substantive, federal district courts in Tennessee have continued to apply the McDonnell Douglas burden shifting framework when considering circumstantial evidence at the summary judgment phase. See Atkins v. Denso Mfg. Tennessee, Inc., 3:09-cv-520, 2011 WL 5023392, at *16 (E.D. Tenn. Oct. 20, 2011) (citing cases). Therefore, the court will apply the same analysis to both the ADEA and THRA claims.

5

discrimination was at least a motivating factor in the employer's actions. Geiger, 579 F.3d at 620. Direct evidence includes both verbal and written statements. Portis v. First Nat'l Bank of New Albany, Miss., 34 F.3d 325, 329 (5th Cir. 1994). The discriminatory statements may come from decisionmakers themselves or from "other persons exerting a meaningful role in the decisionmaking process." Bartlett v. Gates, 421 F. App'x 485, 489 (6th Cir. 2010) (unpublished).

Ms. Woody has demonstrated direct evidence of age discrimination sufficient to preclude a grant of summary judgment. According to a number of employees at the medical center, Ms. Woody's supervisor, Crystal Wilkerson, advertised the shift leader positions using a flyer that stated "young rising stars" were desired as applicants. On its face, the flyer demonstrates a desire for young applicants. Additionally, it is undisputed that Ms. Wilkerson verbally reiterated the desirability of "young rising stars" as applicants for the shift leader positions at various staff meetings and in conversations with the employees. On their face, Ms. Wilkerson's statements show a bias toward young applicants.

Parkwest and Covenant argue that the "young rising stars" statement was a stray remark. But drawing inferences in favor of Ms. Woody, it appears that being a "young rising star" was repeatedly emphasized as a desirable quality in the applicants. The use of that phrase was repeated. It was posted in the bathroom and breakroom that were used by shift leaders, as well as in other areas of the hospital. Moreover, Ms. Woody has submitted evidence showing that Ms. Wilkerson stated many times, both in meetings with current shift leaders and during conversations with other staff, that she wanted "young rising stars" as employees.

Parkwest and Covenant argue that Ms. Wilkerson's statements cannot be considered as direct evidence because Ms. Wilkerson was not a decisionmaker in the hiring process. However,

6

by drawing inferences in favor of Ms. Woody, it appears that Ms. Wilkerson exerted a meaningful role in the decisionmaking process. Ms. Wilkerson set up the peer review process and personally selected those who would sit on the peer interview team. She met with them and gave them instructions about the peer review process. And although she could not remember specifically, Ms. Wilkerson admitted it was possible she told the peer interview team that she was looking for young rising stars. (Wilkerson Dep. 755–24.) Ms. Wilkerson's role in the process was meaningful enough for inferences to be drawn that her alleged discriminatory statements affected the decisionmaking process.

### 2. Circumstantial Evidence of Age Discrimination

Even assuming that Ms. Woody had failed to show direct evidence, she has demonstrated enough circumstantial evidence to make out a prima facie case of age discrimination.

Circumstantial evidence is proof that does not establish discriminatory animus on its face, but does allow a fact finder to draw a reasonable inference that discrimination occurred. Geiger, 579 F.3d at 620. When considering circumstantial evidence, the court uses the McDonnell Douglas burden-shifting framework. Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1329 (6th Cir. 1994). First, Ms. Woody must establish a prima facie case of discrimination. Id. If she establishes a prima facie case, the burden shifts to the Defendants to show a legitimate non-discriminatory reason for the adverse employment action. Id. If the Defendants satisfy their burden, the burden shifts back to Ms. Woody to demonstrate that the Defendants' proffered reason for the adverse employment action is pretext. Id.

**Prima Facie Case of Age Discrimination**

To establish a prima facie case of age discrimination, Ms. Woody must show by a

preponderance of the evidence that (1) she is over forty years old, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by a younger person. Geiger, 579 F.3d at 622. The first three elements are not disputed.

Parkwest and Covenant argue that Ms. Woody cannot satisfy the fourth element because she was not replaced because she never lost her job; instead she went through a "role change." (Duncan Dep. 27:18, June 24, 2011, Docket No. 17-9.) Drawing inferences in favor of Ms. Woody, it appears that she went through a job change. Her title changed, the prestige of her position decreased, and she earned less money. Indeed, Parkwest's own financial department classified the change as a "job change." (Duncan Dep. 55:19–56:12 & Ex. 6.)

Defendants further state that Ms. Woody was not replaced because the position of shift leader was changed by adding six new responsibilities to the job description. But an employer cannot avoid liability by merely changing the job description or making minor changes to the position. Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 n.10 (6th Cir. 1990). Ms. Woody presented evidence that the six responsibilities added to the job description were merely codifications of tasks already being performed by shift leaders. (Woody Dep. 81:1–88:25, June 20, 2011, Docket No. 25-2.) In addition, the old position that Ms. Woody held was substantially similar to the new position for which she applied and was ultimately rejected. Both positions are entitled "shift leader," were for the nighttime shift leader position, and included all the duties Ms. Woody had in her old position, such as overseeing the nursing staff and ensuring the management and care of patients.

**Legitimate Non-Discriminatory Reason**

Assuming Ms. Woody can make out a prima facie case of age discrimination, Parkwest

and Covenant have the burden of showing a legitimate nondiscriminatory reason for requiring that Ms. Woody reapply for her position as shift leader and then not hiring her after she applied.

Parkwest and Covenant contend that the reason they made all the shift leaders reapply for their jobs was because the shift leaders were not consistently performing their duties and patient and staff needs were not being met. Parkwest and Covenant also argue that Ms. Woody was not performing her job satisfactorily because she was absent from too many staff meetings and was not running things as smoothly as she should. Parkwest and Covenant have carried their burden of showing a legitimate non-discriminatory reason for the choice to make the shift leaders reapply for their positions.

**Pretext**

At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012) (quoting Romans v. Mich. Dep't of Human Servs., 668 F.3d 826, 839 (6th Cir. 2012)). The three categories are not rigid classifications, but instead are merely "a convenient way of marshaling evidence and focusing it on the ultimate inquiry." Id. "[A]t bottom, the question is always whether the employer made up its stated reason to conceal intentional discrimination." Chen, 580 F.3d at 400 n.4.

Ms. Woody has produced sufficient evidence for a jury to reasonably question the

9

Defendants' explanation. As noted above, Ms. Wilkerson repeatedly indicated that she wanted "young rising stars" to fill the shift leader positions, and Ms. Wilkerson was the individual that set up the hiring process and selected the members of the peer review panel. This information could be used by a jury to reasonably infer that Ms. Wilkerson orchestrated and influenced the peer review process as a means of pushing older workers out of the shift leader position in favor of younger individuals.

Moreover, Ms. Woody presented circumstantial evidence which reasonably paints an inference that Ms. Wilkerson may have preselected the individual who replaced Ms. Woody as shift leader. Some of the members of the peer review team—based on their interactions with Ms. Wilkerson—felt that it was a forgone conclusion that a man under the age of forty, Matt Adams, would be hired. And at various times before and during the hiring process, Mr. Adams bragged that he would soon fill the shift leader position. Mr. Adams sent texts to a coworker talking about changes to his work schedule, urged her to keep their communications secret, and then asked her to delete those texts so that "there is no black and white proof of what has been said." (Adams Dep. Ex. 5, at 2, June 21, 2011, Docket No. 25-12, at 30.)

Those facts could reasonably allow a jury to find Ms. Wilkerson preselected a person under forty to replace Ms. Woody as shift leader.[6]

---

[6] Defendants urge the court to apply the so-called "same actor inference" and infer that Ms. Wilkerson could not have had discriminatory animus toward Ms. Woody in 2010 because Ms. Wilkerson was the same actor who solicited Ms. Woody to originally apply for the position of shift leader in 2008. See Myers v. U.S. Cellular Corp., 3:05-cv-511, 2007 WL 230100, at *11–12 (E.D. Tenn. Jan. 26, 2007) aff'd, 257 F. App'x 947 (6th Cir. 2007).
The same actor inference, however, is not mandatory, and may be vitiated by other evidence. Id. at 11. Moreover, the same actor inference "is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact."

10

C.  **Claim for Punitive Damages**[7]

In her Complaint, Ms. Woody requests "punitive damages in the amount of One Million Dollars ($1,000,000)." (Compl. at 8, Docket No. 1-2.) In their motion for partial summary judgment, Defendants ask the court to dismiss the claim for punitive damages because punitive damages are not allowed under the ADEA. Ms. Woody concedes that punitive damages are generally not allowed under the ADEA, but she requests that the court interpret the claim for punitive damages as a claim for liquidated damages.

Punitive damages—in their traditional sense—are not recoverable for age-related claims under either the ADEA. See Cripps v. United Biscuit of Great Britain, 732 F. Supp. 844, 846 (E.D. Tenn. 1989); Bruno v. W. Elec. Co., 829 F.2d 957, 966 (10th Cir. 1987) (noting that a majority of the circuit courts have held that punitive damages are not allowed in ADEA cases). Instead, a plaintiff may recover liquidated damages for willful violations of the ADEA. 29 U.S.C. ¶ 626(b) (2012); Spengler v. Worthington Cylinders, 615 F.3d 481, 495 (6th Cir. 2010). Because "liquidated damages are punitive in nature," Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128 (1985), the court may construe a plaintiff's claim for punitive damages under the ADEA as a claim for liquidated damages. See Branson v. Harrah's Tunica Corp., 832 F. Supp. 2d 929, 939 n.12 (W.D. Tenn. 2011). Liquidated damages are recoverable in an amount equal to the award of back pay, so long as the plaintiff proves the employer acted willfully. Wheeler v.

---

Id. (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 573 (6th Cir.2003)).
     As described above, Ms. Woody has presented evidence sufficient to undermine the same actor inference that might otherwise be afforded to Ms. Wilkerson's conduct.

     [7] Ms. Woody has withdrawn her claim for punitive damages under the THRA. (Pl.'s Mem. Opp'n to Defs.' Mot. Partial Summ. J., at 4, Docket No. 33.) The court, therefore, need only address Ms. Woody's claim for punitive damages under the ADEA.

11

McKinley Enters., 937 F.2d 1158, 1163–64 (6th Cir. 1991).

The court is persuaded that Ms. Woody's claim for punitive damages could reasonably be interpreted as a claim for liquidated damages, although Defendants' argument that the amount of the claim is grossly out of proportion is well-taken. Therefore, the court limits its interpretation of the liquidated damages to an amount equal to the award of back pay. See Wheeler, 937 F.2d at 1163.

### III. CONCLUSION

For the foregoing reasons, the court ORDERS the following:

- Defendants' Motion for Summary Judgment (Docket No. 17) is DENIED;

- Defendants' Motion for Partial Summary Judgment (Docket No. 27) is DENIED IN PART based on the court's conclusion that Ms. Woody may attempt to recover liquidated damages to an amount equal to the award of back pay; and

- Defendants' Motion for Partial Summary Judgment (Docket No. 27) is GRANTED IN PART based on the court's conclusion that all other forms of punitive damages are not allowed under the ADEA.

DATED this 8th day of May, 2013.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge